**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WESTERN WATERSHEDS PROJECT;
RALPH MAUGHAN; IDAHO WILDLIFE
FEDERATION; IDAHO CONSERVATION
LEAGUE; NATURAL RESOURCES
DEFENSE COUNCIL; NATIONAL
WILDLIFE FEDERATION,
          *Plaintiffs-Appellees,*

v.

JOE KRAAYENBRINK; JAMES L.
CASWELL; BUREAU OF LAND
MANAGEMENT; DAVE PACIORETTY;
DIRK KEMPTHORNE; DAVID
ROSENKRANCE,

          *Defendants,*

PUBLIC LANDS COUNCIL,
          *Defendant-intervenor,*

          and

AMERICAN FARM BUREAU
FEDERATION,
    *Defendant-intervenor-Appellant.*

No. 08-35359

D.C. No.
4:05-cv-00297-BLW

WESTERN WATERSHEDS PROJECT;
RALPH MAUGHAN; IDAHO WILDLIFE
FEDERATION; IDAHO CONSERVATION
LEAGUE; NATURAL RESOURCES
DEFENSE COUNCIL; NATIONAL
WILDLIFE FEDERATION,
             *Plaintiffs-Appellees,*

             v.

JOE KRAAYENBRINK; JAMES L.
CASWELL; BUREAU OF LAND
MANAGEMENT; DAVE PACIORETTY;
DIRK KEMPTHORNE; DAVID
ROSENKRANCE,

                   *Defendants,*

AMERICAN FARM BUREAU
FEDERATION,
             *Defendant-intervenor,*

             and

PUBLIC LANDS COUNCIL,
    *Defendant-intervenor-Appellant.*

No. 08-35360

D.C. No.
4:05-CV-00297-
BLW

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted
November 2, 2009—Portland, Oregon

Filed September 1, 2010
Amended January 19, 2011

Before: Raymond C. Fisher and Richard A. Paez,
Circuit Judges, and Barry Ted Moskowitz,* District Judge.

Opinion by Judge Paez

---

*The Honorable Barry Ted Moskowitz, United States District Judge for the Southern District of California, sitting by designation.

**COUNSEL**

Roderick E. Walston, Best Best & Krieger LLP, Walnut Creek, California, Kathryn Kusske Floyd, Jay C. Johnson, Mayer Brown LLP, Washington, D.C., for petitioners Public Lands Council and American Farm Bureau Federation.

Joseph Feller, National Wildlife Federation, Boulder, Colorado, Johanna H. Wald, Natural Resources Defense Counsel, San Francisco, California, Todd C. Tucci, Lauren M. Rule, Advocates for the West, Boise, Idaho, Laurence ("Laird") J. Lucas, Boise, Idaho, for respondents Western Watersheds Project, Ralph Maughan, Idaho Conservation League, Idaho Wildlife Federation, National Wildlife Federation, and Natural Resources Defense Council.

**ORDER**

The Opinion, filed on September 1, 2010 and reported at 620 F.3d 1187 (9th Cir. 2010), is amended as follows:

1.   At slip op. 13266, 620 F.3d at 1209, the citation <*see also Defenders of Wildlife v. Flowers,* 414 F.3d 1066, 1072 (9th

Cir. 2005)> is replaced with <*see also Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1193 (9th Cir. 1988).>

2.   At slip op. 13266, 620 F.3d at 1210, the citation <*see Defenders of Wildlife*, 414 F.3d at 1072.> is replaced with <*see Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018-19 (9th Cir. 2009).>

3.   At slip op. 13267, 620 F.3d at 1210, the citation <*see also Defenders of Wildlife,* 414 F.3d at 1074 (holding that the Corps arbitrarily refused to initiate Section 7 consultation where FWS demanded consultation).> is deleted.

An Amended Opinion is filed concurrently with this Order.

With those amendments, the petition for panel rehearing is denied.

The petition for rehearing en banc was circulated to the full court and no judge called for rehearing en banc. Fed. R. App. P. 35.

The petition for hearing en banc is denied.

No further petitions for rehearing shall be filed.

Taxation of costs against Public Lands Council is reinstated.

---

## OPINION

PAEZ, Circuit Judge:

The Bureau of Land Management (BLM) is the federal agency charged with overseeing livestock grazing on over 160 million acres of public land in the western United States. Pur-

suant to the BLM's authority under the Taylor Grazing Act of 1934, 43 U.S.C. § 315 *et seq.*, the BLM has adopted regulations that implement its grazing management responsibilities. *See* 43 C.F.R. § 4100 *et seq.*

On July 12, 2006, the Secretary of the Interior proposed eighteen amendments to the BLM's grazing regulations (collectively the 2006 Regulations). *See* 71 Fed. Reg. 39,402. The stated purpose of the proposed amendments was to improve the working relationships with permittees and lessees (i.e. ranchers), to protect the health of rangelands, and to increase the administrative efficiency and effectiveness of the BLM grazing management program. *See id.* at 39,402, 39,403; *see also* Proposed Revisions to Grazing Regulations for the Public Lands, Final Impact Statement (Final EIS) at ES-5, 4-38. Among other changes, the proposed amendments decreased public involvement in public lands management, put new limitations on the BLM's enforcement powers, and increased ranchers' ownership rights to improvements and water on public lands.

Western Watersheds Project and Maughan *et al.* (collectively Plaintiffs) challenged the new amendments on procedural and substantive grounds. Plaintiffs argued that the BLM violated the National Environmental Policy Act (NEPA) by failing to take the required "hard look" at the environmental effects of the revised regulations; failed to consult with the United States Fish & Wildlife Service (FWS) as required by the Endangered Species Act (ESA); and violated the Federal Land Policy and Management Act (FLPMA) in promulgating the 2006 Regulations.

Shortly after the suit was filed, Public Lands Council and the American Farm Bureau Federation (collectively Intervenors)—two organizations that represent the interests of ranchers in the western states—intervened on behalf of the BLM to defend the proposed amendments. In June 2007, the district court granted summary judgment to Plaintiffs and

enjoined enforcement of the proposed regulations. *W. Watersheds Project v. Kraayenbrink*, 538 F. Supp. 2d 1302, 1324 (D. Idaho 2008).

The BLM and Intervenors separately appealed. In December 2008, the BLM filed a motion to dismiss the agency's appeal, which we granted, and the BLM no longer seeks to challenge the district court's judgment or defend the proposed amendments. Intervenors maintain their appeal. Plaintiffs challenge Intervenors' standing to defend the 2006 Regulations without the BLM as a party to this appeal. Indeed, the BLM filed an amicus brief in support of Plaintiffs' standing challenge. Intervenors counter that not only do they have standing but Plaintiffs lack standing and their claims are not ripe. We conclude that both parties have standing and that Plaintiffs' claims are ripe.

Because we agree with the district court that the BLM violated NEPA and the ESA in adopting the 2006 amendments, we affirm the court's grant of summary judgment to Plaintiffs as to these claims. We also affirm the district court's permanent injunction enjoining the BLM regulations as set forth in the Federal Register of July 12, 2006, amending 43 C.F.R. Part 4100 *et seq.* Because the district court erred when it failed to consider Plaintiffs' FLPMA claim under the framework and with the deference set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984), we vacate the district court's grant of summary judgment in favor of Plaintiffs on this claim and remand it for further consideration.

## I.   Background

The history of regulation of the western rangelands is less than eighty years old. Despite its relative brevity, however, that history reflects the wisdom of lessons learned. Because those lessons are recorded, in part, in the BLM's past amendments to its grazing regulations, we begin with a brief account

of the history of federal regulation of range management in the western states.

## A.  Development of Grazing Regulation

Prior to 1934, the public rangelands were unregulated and ranchers freely grazed livestock on the publicly owned range. *See Public Lands Council v. Babbitt*, 529 U.S. 728, 731 (2000). Lack of oversight, "[p]opulation growth, forage competition, and inadequate range control all began to have consequences both serious and apparent" for the western rangelands. *Id.* at 733. Over-grazed and suffering from a terrible drought, the range was swept by dust storms. "The devastating storms of the Dust Bowl were in the words of one Senator 'the most tragic, the most impressive lobbyist, that ha[s] ever come to this Capitol.' " *Id.* (quoting 79 Cong. Rec. 6013 (1935)) (alteration in original). On June 28, 1934, President Franklin Roosevelt signed the Taylor Grazing Act, 43 U.S.C. § 315 *et seq.*, into law authorizing the Secretary of the Interior, for the first time, to manage the rangelands and divide them into regulated grazing districts. *Id.* The Taylor Grazing Act's stated purpose was both to "stop injury to the public grazing lands by preventing overgrazing and soil deterioration," 48 Stat. 1269, and to "promote the highest use of the public lands." 43 U.S.C. § 315.

To manage and oversee the division of the public rangelands into grazing districts, the Department of Interior created district advisory boards comprised of local ranchers. *Public Lands Council*, 529 U.S. at 734. The boards became the effective governing body of each grazing district. *Id.*

Nearly three decades after the enactment of the Taylor Grazing Act, however, the Department of Interior had failed to achieve the first of the Act's stated goals, namely, to halt the degradation of the public grasslands. *Id.* at 737. In 1962, 83.4 percent of the public grasslands remained in fair or poor condition. *Id.*

In 1976, Congress enacted FLPMA, 43 U.S.C. § 1701 *et seq*. The stated purpose of FLPMA was to manage the grasslands for "multiple use," *id*. § 1701(a)(7),[1] with an increased emphasis on the management of the public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values." *Id*. § 1701(a)(8).

In 1978, to comply with the new law, the Department of the Interior amended its grazing regulations. *Public Lands Council*, 529 U.S. at 738 (citing 43 Fed. Reg. 29,067). Thereafter, the grazing amendments went largely unchanged until 1995. In 1995, the Department of Interior amended the federal grazing regulations in order to, among other objectives, broaden membership on the district advisory boards, "improve administration of grazing permits and leases, to place greater emphasis on stewardship of the rangeland resource," and "to manage the rangeland resource using an ecological approach." 58 Fed. Reg. 43,208; *see Public Lands Council*, 529 U.S. at 739.

Public Lands Council and other ranching-related organizations with members who held grazing permits sued the Secretary, challenging the new regulations and arguing that they

---

[1]FLPMA defines "multiple use" in relevant part as:

[T]he management of the public lands and their various resource values so that they are utilized in . . . a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

43 U.S.C. § 1702(c).

exceeded the Secretary's authority under the Taylor Grazing Act. *Public Lands Council*, 529 U.S. at 739. The Supreme Court held that the amendments did not exceed the Secretary's authority under the Act, and the 1995 amendments went into effect (hereinafter the 1995 Regulations). *Id.* at 743, 748, 750; *see* 43 C.F.R. § 4100 *et seq.* (1995).

## B.    The 2006 Regulatory Changes

In 2002, the Secretary of the Interior began efforts once again to amend the regulations governing BLM's oversight of livestock grazing on public lands. *See W. Watersheds Project*, 538 F. Supp. 2d at 1306-07. The BLM developed a list of proposed changes and assembled an interdisciplinary team of experts to review them. *Id.*

In July 2002, the BLM interdisciplinary team reported that the proposed "changes [that limit public participation] conflict with the spirit of the Secretary's 4 C's [communication, consultation, cooperation, and conservation] because they explicitly allow for excluding a segment of the population [i.e. the non-ranching public] who would otherwise choose to publicly participate." AR 67849. The report further explained that "[r]estricting public participation will ultimately lead to poorer land management decisions . . . [and] environmental harm, without necessarily sustaining or improving economic conditions." *Id.* The BLM, however, made no substantial changes to the proposed changes and published them in December 2003 for comment. *See* 68 Fed. Reg. 68,453.

Following the public comment period, a second interdisciplinary BLM team reviewed the proposed amendments. That team was led by an official from the BLM's Washington D.C. office and included a fisheries biologist, a wildlife biologist, a hydrologist, a soils scientist, and other specialists in economics, fire, recreation, wild horses, and archeology. *See W. Watersheds Project*, 538 F. Supp. 2d at 1307. In November 2003, the second BLM interdisciplinary team issued its report

titled the Administrative Review Copy Draft EIS (ARC-DEIS). The ARC-DEIS criticized the new regulations, concluding that if put into effect the changes will cause "a slow long-term adverse effect on wildlife and biological diversity in general." AR 68006.

In December 2003, undeterred, the BLM proceeded to publish the proposed regulations and seek public comment. The BLM assembled a third interdisciplinary team to write the Final EIS. The Final EIS team made substantial changes to the ARC-DEIS and deleted without comment the ARC-DEIS's conclusion that the proposed changes would have adverse impacts on wildlife, biological diversity, and riparian habitats. *See W. Watersheds Project*, 538 F. Supp. 2d at 1308. By March 2006, the BLM issued the Final EIS and Addendum, and in July 2006, the BLM issued its Final Rule and Record of Decision, adopting the proposed changes (i.e. the 2006 Regulations). 71 Fed. Reg. 39,402.

The 2006 Regulations make several major modifications to the 1995 Regulations. Generally, the proposed amendments make changes that fall into three broad categories: (1) public input in public rangelands management; (2) the BLM's environmental enforcement powers; and (3) permittee's and lessee's (i.e. ranchers) ownership rights on public grazing lands. We explain the changes with respect to each broad category in turn.

### 1.  Public input in public rangelands management

The 2006 Regulations both narrow the definition of "interested public" and remove the requirement that the BLM consult, cooperate, and coordinate with the "interested public" with respect to various management decisions.[2] 43 C.F.R.

---

[2] Interested public is defined in the 2006 Regulations as an individual, group or organization that has:

§ 4100.0-5. Under the 1995 Regulations, an individual, group, or organization that submitted a written request to the BLM to be involved in the decision-making process regarding a specific allotment would be put on a list of "interested public" and would receive notice of issues concerning that allotment. 43 C.F.R. § 4300.0-5 (1995). Under the 2006 Regulations, if the individual, group, or organization receives notice but does not comment, it will be dropped from the "interested public" list. *See* 43 C.F.R. § 4300.0-5.

Furthermore, under the 2006 Regulations, the BLM is no longer required to involve interested members of the public when issuing or renewing an individual grazing permit. *Id.* § 4130.2(b). Instead, the BLM must only "consult, cooperate, and coordinate" with "affected permittees and lessees, and the state." *Id.* The 2006 Regulations similarly remove the requirement to consult with the interested public on the following decisions, all of which required consultation under the 1995 Regulations: modifications to the terms in grazing permits, *id.* § 4130.3-3(a); adjustments to allotment boundaries, *id.* § 4110.2-4; changes in active use, *id.* § 4110.3-3(a); emergency allotment closures, *id.* § 4110.3-3(b); and issuance of temporary nonrenewable grazing permits and leases, *id.* § 4130.6-2(a).

---

(1)(i) Submitted a written request to BLM to be provided an opportunity to be involved in the decisionmaking process as to a specific allotment, and

(ii) Followed up that request by submitting written comment as to management of a specific allotment, or otherwise participating in the decisionmaking process as to a specific allotment, if BLM has provided them an opportunity for comment or other participation; or

(2) Submitted written comments to the authorized officer regarding the management of livestock grazing on a specific allotment.

43 C.F.R. § 4100.0-5.

### 2.    Environmental enforcement on public rangelands

The 1995 Regulations required the BLM to take corrective actions upon finding either a violation of the Fundamentals of Rangeland Health[3]—ecological criteria that, pursuant to the 1995 Regulations, all public lands had to meet—or the Standards and Guidelines for Grazing Administration (Standards and Guidelines). 43 C.F.R. §§ 4180.1, 4180.2(c) (1995). The 2006 Regulations eliminate the Fundamentals of Rangeland Health, leaving only the Standards and Guidelines as enforceable standards. 43 C.F.R. § 4180.2(c)(1).

Upon discovery of a violation of either the Fundamentals of Rangeland Health or the Standards and Guidelines, the 1995 Regulations required the BLM to take corrective action "as soon as practicable but not later than the start of the next grazing year." 43 C.F.R. § 4180.1 (1995). The 2006 Regulations extend the time for the BLM to take corrective measures to 24 months. 43 C.F.R. § 4180.2(c)(1)(i).

The 2006 Regulations also increase the amount of monitoring required before the BLM can enforce the Standards and Guidelines. Prior to initiating an enforcement proceeding, the 2006 Regulations require that the BLM gather baseline monitoring data to determine "that existing grazing management practices or levels of grazing use on public lands are significant factors in failing to achieve the standards and conform with the guidelines" and only multi-year BLM data (not all available data as provided in the 1995 Regulations) may be considered. *Id*. § 4180.2(c)(1). In short, under the 2006 Regulations, the BLM cannot rely upon other sources for data and must gather monitoring data for each allotment prior to determining whether a rancher has violated the Standards and Guidelines and initiating corrective measures.

---

[3]The 1995 Regulations adopted a new set of ecological mandates for grazing on the public lands, called the Fundamentals of Rangeland Health. 43 C.F.R. § 4180 *et seq.* (1995).

The 2006 Regulations also include a novel "phase-in" provision whereby the BLM is required to phase-in grazing reductions of over ten percent over a five-year period. *Id.* § 4110.3-3(a)(1).

### 3.    Permittee and lessee ownership rights

Under the 2006 Regulations, as under the previous 1995 Regulations, the BLM may enter into cooperative range improvement agreements with a person, organization, or other government entity for the installation, use, maintenance, and/or modification of permanent range improvements or rangeland developments.[4] Under the 1995 Regulations, however, the United States retained full title to any permanent range improvements. Under the 2006 Regulations, the private cooperator and the United States share title to permanent range improvements. *Compare* 43 C.F.R. § 4120.3-2 (1995)*, with* 43 C.F.R. § 4120.3-2.

With respect to water rights, under the 1995 Regulations, to the extent allowed by state law, the right to any water on public lands was held by the United States. 43 C.F.R. § 4120.3-9 (1995). Under the 2006 Regulations, to the extent permitted by state law, permittees, not the United States, acquire and hold water rights on public lands. 43 C.F.R. § 4120.3-9.

In summary, the proposed amendments reduce public oversight of federal grazing management, eliminate the Fundamentals of Rangeland Health as enforceable standards, allow the BLM additional time to respond to failing allotments, increase monitoring requirements, and cede ownership rights to permanent rangeland structures and water from the United States to private ranchers.

---

[4]Permanent range improvements include, according to the BLM 2006 Regulations, such permanent fixtures as fences, buildings, pipelines, wells, reservoirs, and stock tanks. 43 C.F.R. § 4120.3-2.

## II. Standard of Review

We review de novo standing, ripeness, and a district court's grant of summary judgment. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969 (9th Cir. 2003).

Alleged procedural violations of NEPA and FLPMA are reviewed under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2). *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 581 F.3d 1063, 1070 (9th Cir. 2009). In reviewing claims brought under the APA, we will only set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

We review claims brought under the ESA under the citizen-suit provision of the ESA or, when the citizen-suit provision is unavailable, under the APA. *See Coos County Bd. of County Comm'rs v. Kempthorne*, 531 F.3d 792, 802 (9th Cir. 2008). Irrespective of whether an ESA claim is brought under the APA or the citizen-suit provision, the APA's "arbitrary and capricious" standard applies; and, an agency's "no effect" determination under the ESA must be upheld unless arbitrary and capricious. *See Or. Natural Res. Council v. Allen*, 476 F.3d 1031, 1036 (9th Cir. 2007). Critical to that inquiry is whether there is "a rational connection between the facts found and the conclusions made" in support of the agency's action. *Or. Natural Res. Council v. Brong*, 492 F.3d 1120, 1131 (9th Cir. 2007) (internal quotation marks omitted).

Review of the BLM's interpretation of its own statutory mandate, including review under the APA, requires application of the deference principle recognized in *Chevron*. *See Nw. Envtl. Advocates v. E.P.A.*, 537 F.3d 1006, 1014 (9th Cir. 2008).

## III. Discussion

### A. Standing

Both parties challenge the other's standing on appeal. Furthermore, the BLM submitted an amicus brief in support of Plaintiffs' argument that Intervenors' lack Article III standing to maintain their appeal absent the government.

### 1. Intervenors' Standing

As noted above, Public Lands Council and American Farm Bureau Federation intervened on behalf of the BLM in the district court and now pursue this appeal. Although the BLM filed a notice of appeal, it subsequently abandoned its appeal. The end result is that Intervenors seek to defend the 2006 Regulations—regulations that the BLM itself no longer seeks to defend.

While this situation presents an unusual circumstance, it is not one without precedent, and it is well established that the government is not the only party who has standing to defend the validity of federal regulations. *See, e.g.*, *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1110 (9th Cir. 2002) (holding that intervenors could appeal and challenge the grant of injunctive relief by defending the government's action against alleged violations of NEPA when the federal defendants decided not to appeal); *see also Didrickson v. U.S. Dep't of the Interior*, 982 F.2d 1332, 1339 (9th Cir. 1992) (holding that environmental groups had standing to defend government regulations on appeal, despite the government's dismissal of its appeal); *Nat'l Wildlife Fed'n v. Lujan*, 928 F.2d 453, 456 n.2 (D.C. Cir. 1991) (same).

**[1]** Absent the government, however, Intervenors must now, and for the first time, establish Article III standing. *See Diamond v. Charles*, 476 U.S. 54, 68 (1986) ("[A]n intervenor's right to continue a suit in the absence of the party on

whose side intervention was permitted is contingent upon a showing by the intervenor that he fulfills the requirements of Art. III."); *see also Didrickson*, 982 F.2d at 1338 ("An interest strong enough to permit intervention is not necessarily a sufficient basis to pursue an appeal abandoned by the other parties.").

**[2]** In these circumstances, Intervenors' standing need not be based on whether they would have had standing to independently bring this suit, but rather may be contingent on whether they have standing now based on a concrete injury related to the judgment. *See Didrickson*, 982 F.2d at 1338; *see also Idaho Farm Bureau Fed'n v. Babbit*, 58 F.3d 1392, 1398 (9th Cir. 1995). To invoke this court's jurisdiction on the basis of an injury related to the judgment, Intervenors must establish that the district court's judgment causes their members a concrete and particularized injury that is actual or imminent and is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Furthermore, since Intervenors seek associational standing on behalf of their members, there are three related but distinct Article III standing requirements. *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1122 (9th Cir. 2009).

> An association has standing to bring suit on behalf of its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (bracketed numbers added).

Public Lands Council[5] is a national organization of public

---

[5]Because Intervenors Public Lands Council and American Farm Bureau Federation both submitted supplemental briefs and declarations in support of their standing, we address the two organizations' standing separately.

lands ranchers that represents the interests of sheep and cattle ranchers in fifteen western states. Public Lands Council submitted four declarations from its members to establish Article III standing to pursue this appeal on behalf of the organization's members.[6] "It is common ground that . . . [an] organization[ ] can assert the standing of its members." *Summers*, 129 S. Ct. at 1149. But the organization asserting standing must provide "specific allegations establishing that at least one identified member [has] suffered or would suffer harm," *id.* at 1151, and "generalized harm . . . will not alone support standing," *id.* at 1149.

**[3]** Here, we conclude that Public Lands Council has standing to pursue this appeal on behalf of its members

---

[6]In conducting our review, except for unusual circumstances, we consider only the district court record. *See Lowry v. Barnhart*, 329 F.3d 1019, 1024 (9th Cir. 2003). Here, "[w]e accept the supplemental declarations because the [intervenors] were not required, under Ninth Circuit law, to establish standing in order to intervene; only now must they demonstrate particularized injury." *Didrickson*, 982 F.2d at 1340 (internal citation omitted). In its amicus brief, the government argues that Intervenors should not be permitted to submit these supplemental declarations. The government cites *Summers v. Earthland Inst.*, 129 S. Ct. 1142, 1150 n* (2009), for the proposition that affidavits filed after the district court enters final judgment will not be considered. The situation in *Summers*, however, was distinct. In *Summers*, the parties whose standing was questioned were not intervenors, but rather the original plaintiffs who first challenged the application of Forest Service regulations to one particular forest, and then—for the first time on appeal and after the original claim had been resolved—sought to challenge the Forest Service's regulations generally. *Id.* at 1149. The supplemental standing affidavits in that case were filed with the district court after the government had filed its appeal. The Supreme Court's refusal to consider those affidavits merely stands for the proposition that standing—where it would have been necessary to bring the claim in the district court—cannot be created retroactively and that in the absence of a live dispute over concrete application of government regulations, plaintiffs did not have standing to challenge the regulations in general for the first time on appeal. Here, unlike in *Summers*, Intervenors were not required to establish Article III standing in district court, nor are they now pursuing a new claim following resolution of the original claim.

Charles Rex and Dallas Horton. On June 11, 2007, Charles Rex entered into a cooperative range improvement agreement with the BLM, which included provisions to construct pipeline and livestock water troughs across public and private lands. *See* Decl. of Charles Rex ¶¶ 1-2. The project was completed in 2009; however, "the Federal District Court's decision has prevented the Partnership from obtaining title and ownership of the rangeland improvement project . . . ." *Id.* ¶¶ 3-4. Charles Rex's inability to obtain title is an injury in fact that is actual, not conjectural or hypothetical; that injury is fairly traceable to the district court's judgment; and it is likely to be redressed by a favorable decision. *See Didrickson*, 982 F.2d at 1338.

Public Lands Council member Dallas Horton has federal grazing permits on various BLM allotments. *See* Decl. of Dallas Horton ¶ 1. The BLM recently issued a proposed decision to renew his grazing permits; however, the agency indicated that his grazing permits may not comply with the applicable standards and guidelines and has proposed a thirty percent reduction of grazing. *Id*. ¶ 2. The district court's order enjoining the 2006 Regulations effectively requires the BLM to take prompt corrective action against Horton rather than phasing in any reduction of grazing over a five-year period. Horton has also suffered an injury in fact that is traceable to the district court's judgement and is likely to be redressed by a favorable decision.

**[4]** Because Public Lands Council's members Charles Rex and Dallas Horton would have standing to pursue this appeal in their own right, their interests are germane to Public Lands Council's purpose, and neither the claims asserted nor relief requested requires Charles Rex's nor Dallas Horton's participation as parties, Public Lands Council has associational standing to pursue the appeal. Intervenors, therefore, have Article III standing.[7]

---

[7]Because we conclude that Public Lands Council has standing, we need not consider whether American Farm Bureau Federation also has standing. *See Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993).

## 2.  Plaintiffs's Standing

Intervernors also challenge Plaintiffs' standing to assert their claims. "[Article III] limits are jurisdictional: they cannot be waived by any party, and there is no question that a court can, and indeed must, resolve any doubts about this constitutional issue." *City of Los Angeles v. County of Kern*, 581 F.3d 841, 845 (9th Cir. 2009).

To have standing, Plaintiffs must meet the established three part test outlined above for each claim. *See Lujan*, 504 U.S. at 560; *see also DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 342 (2006). In addition, a plaintiff bringing suit under the APA for a violation of NEPA or FLPMA must show that the alleged injury falls within NEPA's "zone of interests." *Kootenai Tribe of Idaho*, 313 F.3d at 1111-12.

An individual bringing a substantive claim related to environmental harms may establish an injury in fact by showing "a connection to the area of concern sufficient to make credible the connection that the person's life will be less enjoyable —that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000). We have held that an environmental group had standing to bring a NEPA claim when its members enjoyed photographing marine life, fishing, and watching marine life in the area potentially affected by the challenged government action. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859-60 (9th Cir. 2005). We have held that environmental groups had standing to bring an ESA claim where the groups' members regularly used and enjoyed an area inhabited by the imperiled species. *Idaho Farm Bureau Fed'n*, 58 F.3d at 1399.

**[5]** Here, Western Watersheds Project submitted five declarations in the district court, which identify both a concrete

interest in and an imminent harm to specific allotments of BLM land to which the 2006 Regulations apply. Western Watersheds Project is designated as an "interested public" and is actively engaged in how the BLM manages public lands in Idaho, Utah, Nevada, Oregon, Montana, Wyoming, Colorado, and California. *See* Decl. of Jon Marvel ¶¶ 5-8. Jon Marvel, founder of Western Watersheds Project, identified numerous BLM grazing allotment sites in Idaho, Utah, Wyoming, and Montana that he has personally visited and continues to visit, study, enjoy, and in which he pursues recreational activities. *Id.* ¶¶ 12-13. Kathleen Fite, a member of Western Watersheds Project and the organization's Biodiversity Director, identified specific affected locations and allotments that she visits, studies, works to protect, and over which the 2006 Regulations will exclude her from participating in various management decisions. Decl. of Kathleen Kite ¶¶ 1, 17-19, 57-59.

**[6]** In sum, the 2006 Regulations pose an imminent harm to Western Watersheds Project's members' aesthetic enjoyment of the rangeland and to their involvement in public land grazing management. *See Summers*, 129 S. Ct. at 1149 (holding that if the harm alleged "in fact affects the recreational or even the mere aesthetic interests of the plaintiff, that will suffice" for standing purposes (citing *Sierra Club v. Morton*, 405 U.S. 727, 734-36 (1972))); *see also Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1517 (9th Cir. 1992) (concluding that declarations naming specific areas used by group's members were sufficient to show particularized threat of injury).

**[7]** Plaintiffs also bring a procedural claim under NEPA. To satisfy the injury in fact requirement, and thereby meet the first prong of Article III standing, "a plaintiff asserting a procedural injury must show that the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Citizen for Better Forestry*, 341 F.3d at 969 (internal quotation marks omitted). We have described the concrete interest test as "requiring a

geographic nexus between the individual asserting the claim and the location suffering an environmental impact." *Id.* at 971 (internal quotation marks omitted). The Kite and Marvel declarations establish a geographic nexus between Western Watersheds Project's members and the locations subject to the 2006 Regulations, and, therefore, Western Watersheds Project has established a concrete interest sufficient to pursue their NEPA claim.

"Once a plaintiff has established an injury in fact under NEPA the causation and redressability requirements are relaxed." *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir.2001). "[T]he members must show only that they have a procedural right that, if exercised, *could* protect their concrete interests . . . ." *Defenders of Wildlife v. EPA*, 420 F.3d 946, 957 (9th Cir. 2005) *rev'd on other grounds sub nom. Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007). Because "it is enough that a revised EIS may redress plaintiffs' alleged injuries," Western Watersheds Project satisfies the causation and redressability requirements. *Kootenai Tribe of Idaho*, 313 F.3d at 1113.

Plaintiffs also meet the requirements for associational standing: the interests at stake are pertinent to the interests of Plaintiffs, and there is no indication that resolving this case would require or even be aided by the participation of either organizations' individual members. *Friends of the Earth*, 528 U.S. at 180-81.

**[8]** Finally, Plaintiffs' NEPA and FLPMA claims fall within the statutes' respective zones of interest. *See Kootenai Tribe of Idaho*, 313 F.3d at 1113-14. Western Watersheds Project—a non-profit conservation group engaged in advocating science-based management, land restoration, public education, and conservation of BLM's public lands with thousands of members that study, recreate, and enjoy aesthetic pursuits on the affected grasslands—has a direct interest in seeing that the BLM adequately considers the environmental

consequences of its planned action as required by NEPA and that the well-being of the affected land not be threatened. *See Cantrell*, 241 F.3d at 679 (holding that birdwatchers' interest in preventing adverse environmental effects from agency action fell "squarely" within the zone of interests of NEPA). Finally, Western Watersheds Project's interest in protecting public grasslands, ensuring public participation in the management of the grasslands, and protecting the species that live there from over-grazing falls squarely within the zone of interests protected by FLMPA. *See Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1179 (9th Cir. 2000). Plaintiffs have Article III standing.

## B.  Ripeness

Intervenors argue that Plaintiffs' actions are not ripe for review because the 2006 Regulations have not yet been applied by the BLM. Ripeness serves "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). We apply a two-part test to determine if a case satisfies prudential requirements for ripeness: the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration. *See California v. U.S. Dep't of Agric.*, 575 F.3d 999, 1011 (9th Cir. 2009).

**[9]** Here, the dispute would not interfere with further administrative action because both the EIS and the 2006 Regulations are final. Plaintiffs are "taking advantage of what may be their only opportunity to challenge [the agency regulations] on a nationwide, programmatic basis." *Id.* As the Supreme Court has noted, "a person with standing who is injured by a failure to comply with the NEPA procedures may

complain of that failure at the time the failure takes place, for the claim can never get riper." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 737 (1998). The dispute over the 2006 Regulations is ripe for adjudication.

## C.    National Environmental Policy Act

In passing NEPA, Congress "recogniz[ed] the profound impact of man's activity on the interrelations of all components of the natural environment" and set out "to create and maintain conditions under which man and nature can exist in productive harmony." 42 U.S.C. § 4331(a). To bring federal action in line with Congress' goals and to foster environmentally informed decision-making by federal agencies, NEPA "establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences." *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989)). Foremost among those procedures is the preparation of an environmental impact statement (EIS).

Agencies considering "major Federal actions significantly affecting the quality of the human environment" are required to prepare an EIS. 42 U.S.C. § 4332(C). The EIS "shall provide full and fair discussion of [the] significant environmental impacts" of the proposed action. 40 C.F.R. § 1502.1. That discussion serves two purposes:

> First, it ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts. Second, it guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (internal quotation marks, brackets, and citation omitted). By

focusing agency and public attention on the environmental effects of proposed agency action, "NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989).

Here, the BLM prepared a Final EIS in which it concluded that the proposed 2006 Regulations and related changes to the management of grazing on public rangelands would not have significant environmental effects. Final EIS at ES-5, 4-38. Plaintiffs challenge the BLM's no effect finding and argue that it is arbitrary and capricious. Specifically, Plaintiffs argue that the BLM (1) failed to take a "hard look" at the environmental consequences of the proposed changes and to respond adequately to concerns and criticisms raised by the agency's own experts, FWS, and other agencies; (2) failed to consider adequately the combined effects of the regulatory changes; and (3) failed to offer a reasoned explanation for why the BLM was changing its grazing management policies, particularly given that the BLM seeks to reduce public participation and roll back environmental protections. We address the three NEPA challenges in turn.

First, Plaintiffs argue that the BLM failed to take a "hard look" at the significant environmental impacts of the 2006 Regulations. In particular, they fault the BLM for failing to respond to concerns raised by its own experts, FWS, the Environmental Protection Agency (EPA), and state agencies that the following changes would have significant environmental consequences: (1) reduction in public oversight and consultation in the management of grazing on public rangelands; (2) delayed enforcement, elimination of the Fundamentals of Rangeland Health as enforceable standards, and increased monitoring requirements prior to enforcement of the Standards and Guidelines; and (3) expansion of private rights to permanent structures and water on public lands. With respect to each of these three revisions, we review the comments and concerns raised by the public and interested agencies in

response to publication of the draft EIS. We also review the BLM's response in the Final EIS to those comments. To avoid redundancy, we save our discussion of whether the BLM complied with the requirements of NEPA to take a "hard look" at significant environmental impacts for the end.

### 1.  Public participation in the management of grazing on public rangelands

It is undisputed that the 2006 Regulations significantly reduce public oversight of grazing on public land. The effect of that reduction, however, and whether there are foreseeable and related environmental consequences is disputed.

The first interdisciplinary team of experts assembled by the BLM to review the proposed regulations in 2002 cautioned that:

> The [revised] definitions of interested and interested public appear, by themselves, benign. However, using those definitions . . . appear[s] to allow the exclusion of virtually all other [i.e. non-rancher] members of the public who may otherwise want to participate. . . . Restricting public participation will ultimately lead to poorer land management decisions . . . [and] to greater environmental harm, without necessarily sustaining or improving economic conditions.

AR 67848-49. In November 2003, a second interdisciplinary team of experts assembled by the BLM expressed concern about the proposed reduction in public oversight and consultation in the management of public rangelands. In their report to the BLM, the interdisciplinary team concluded that the deletion of the requirement to consult, cooperate, and coordinate with or seek review and comment from the interested public *would* result in long-term adverse impacts to wildlife and special status species on public lands. AR 68009. That

report further concluded that the requirement for the BLM to cooperate with established grazing boards "will result in giving permittees and lessees greater access to the decision making process at the expense of conservation groups who are advocates for wildlife resources," resulting in "a long-term adverse impact for wildlife and special status species resources." *Id.*

FWS officials also reviewed the 2006 Regulations prior to publication and expressed concern. Specifically, in their report to the BLM, the FWS officials commented that the proposed reduction in public oversight may constrain biologists and range conservationists from recommending and implementing management changes and that "[FWS] believe[s] these aspects of the proposed revisions have the potential to be detrimental to fish and wildlife resources."[8] AR 68058.

Similar comments expressing concern that reduced public oversight would have negative environmental consequences were submitted by the New Mexico Department of Game and Fish, California Department of Fish and Game, and Arizona Department of Game and Fish, among other state agencies.

In the Final EIS, the BLM explains that it reduced the involvement of "interested public," by eliminating the ability to comment as to some management decisions and increasing

---

[8]The FWS report is titled "U.S. Fish and Wildlife Service Comments Proposed Rules for Grazing Administration—Exclusive of Alaska and Draft Environmental Impact Statement: Proposed Revisions to Grazing Regulations for the Public Lands," and was faxed by FWS to the lead contact on the BLM team. The BLM argues that the FWS comments are unsigned and labeled "Draft." The comments, however, are detailed, extensive, and contained in 17 pages of thoughtful and well-written analysis. As the district court pointed out, the report bears no sign that it was mistakenly sent or that it is anything other than the official position of FWS on the proposed regulations. "Indeed, the subsequent conduct of the parties shows that the fax was official and got the BLM's attention. On October 12, 2005, the BLM met with the FWS to address the very concerns raised in the fax." *W. Watersheds*, 538 F. Supp. 2d at 1321.

the requirements to do so for others, to improve efficiency and reduce the costs of sending periodic mailings to interested public members who are not in fact active participants. Final EIS at 5-95. The BLM concludes that the 2006 Regulation's changes to public participation will not affect the environment. *Id.* at 4-36, 4-37. The BLM states that the reduction in public participation "should allow the BLM to make more timely decisions. Thus, it would have a beneficial effect on vegetation resources." *Id.* at 4-32. The Final EIS also notes that the changed definition of interested public "would enable the BLM to focus communication efforts on those interested publics who are involved in the significant issues occurring on grazing allotments." *Id.* at 4-27. The BLM further explains that "[w]hile public input may help identify environmental impacts, the BLM's experience under the existing regulations is that public participation . . . can be inefficient and unproductive and, in some instances, redundant." Appendix FEIS at 37.

**2. Elimination of the Fundamentals of Rangeland Health as enforceable standards, delayed enforcement, and increased monitoring requirements**

Before they were amended, the BLM's grazing regulations required the BLM to take corrective action whenever it determined that existing grazing practices were causing violations of either the Fundamentals of Rangeland Health or the Standards and Guidelines. 43 C.F.R. § 4180.2(c) (1995). The 2006 Regulations remove this requirement with respect to the Fundamentals of Rangeland Health. *See* 71 Fed. Reg. 39,508 (amending 43 C.F.R. § 4180.1). Furthermore, upon discovery of non-compliance with applicable Standards and Guidelines, the BLM is required to "phase-in" any grazing reduction of more than ten percent over a period of five years. 43 C.F.R. § 4110.3-3(a)(1). And the BLM, under the 2006 Regulations, has two years to initiate an enforcement action. *Id.* § 4180.2. Finally, the 2006 Regulations require the BLM to "use monitoring data to identify the significant factors that contribute to

failing to achieve the standards or conform with the guidelines," and to propose appropriate action only after it is determined based on that data that "existing grazing management practices or levels of grazing use on public lands are significant factors" in failing to achieve the Standards and Guidelines. *Id.*

Plaintiffs challenge these changes and argue that they will have significant undisclosed and unconsidered environmental consequences. Plaintiffs argue that the Fundamentals of Rangeland Health are a key requirement for ensuring healthy rangelands and the BLM provided no rational explanation for its decision to eliminate them as enforceable standards. Plaintiffs point out that during the adoption of the 1995 Regulations, the Fundamentals of Rangeland Health "were identified as the basic components of rangeland health and were intended to serve as overarching principles to be *supplemented* by the standards and guidelines." 68 Fed. Reg. 68,452, 68,466 (emphasis added).

In the Final EIS, the BLM acknowledges that some comments "expressed concern" that the Standards and Guidelines are replacing the Fundamentals of Rangeland Health. Final EIS at 5-75. The BLM, however, concludes that the Fundamentals are redundant and overly broad and, therefore, there is no environmental consequence of no longer enforcing them directly. *Id.*; *see also* 71 Fed. Reg. 39,402, 39,492-93 (concluding that the Fundamentals are "a duplicate administrative mechanism").

With regard to the delay in enforcement following the finding of a violation of the Standards and Guidelines, the BLM's own team of experts expressed concern. AR 68008. "[T]hese cumulative delaying tactics could result in a protracted 7 year period for full implementation and change and thus would result in a long-term, adverse impact upon wildlife resources and biological diversity, including threatened and endangered and special status species." *Id.*

BLM's experts were not the only ones troubled by the environmental implications of the potential enforcement delays. In its response to the proposed amendments extending the enforcement period, FWS stated that "[i]n the arid West, biological and many physical resources are usually already near thresholds of change," and "[e]xtending the deadline for initiating an appropriate course of action to make remedial changes in grazing practices . . . from 12 to 24 months could be extremely detrimental to long-term range health and fish and wildlife resources." AR 68067-67.

The EPA reviewed the proposed amendments and reported that it was "concerned that this proposed change would allow for an additional twelve months over the current regulations's time frame for making necessary changes." AR 68052.

Finally, the ARC-DEIS observed that "BLM funding and staffing levels do not provide adequate resources for even minimal monitoring and the additional monitoring requirement will further burden the grazing decision process, thus adversely impacting wildlife resources and biological resources in the long-term." AR 68008. FWS further explained that "a requirement for monitoring before a remedial action can even be initiated" may threaten special status species, such as the sage-grouse that require timely "proactive rangewide measures" to ensure their survival. AR 68069.

The EPA also commented on the monitoring changes and expressed concern that the increased monitoring requirements would delay implementing land management changes and impair the BLM's ability to take "action that is necessary to immediately address actions on rangelands that are being degraded by existing uses." AR 68051.

In a comment submitted by the California Department of Fish and Game, that agency similarly took issue with the proposed changes in enforcement and warned of environmental consequences.

> [T]he proposed revisions tend to weaken the ability of local BLM Districts to manage rangelands in a timely fashion by [requiring monitoring and] adding considerable time before action can be taken. The rangeland management process . . . needs to be able to respond to the condition of the rangeland in order to conserve fish and wildlife resources. . . . Rangeland health could be compromised by the proposed requirement that changes requiring more than a 10 percent reduction in grazing could be phased in over 5 years. Fragile ecosystems in arid environments cannot wait that long for change to occur.

AR 61054-55.

In the Final EIS, the BLM acknowledges that changes to the basis for rangeland health determinations, the time frame for taking action to meet rangeland health standards, and increased monitoring requirements may delay administrative enforcement actions. The agency concludes, however, that such delay would affect only a relatively small number of allotments. Final EIS at 4-23, 4-24. This conclusion is based on a five-year BLM study in which the agency assessed 58 million acres of BLM land (or, roughly a third of its total grazing land) and found that 16 percent of allotments failed to meet the Standards and Guidelines due to existing livestock grazing practices or levels of grazing use. *Id*. at 4-24. Therefore, the BLM concluded "at most approximately 16 percent of all allotments evaluated in the future may fail standards due to current livestock grazing practices." *Id*.

### 3. Private rights to permanent improvements and water

The 2006 Regulations also granted permittees shared title to permanent rangeland improvements as well as water rights on public lands to the extent permitted by state law. *See* 43 C.F.R. § 4120.3-9.

In the ARC-DEIS, BLM's experts reported that "[a]uthorizing joint title to range improvements will have [a] very long lasting adverse impact to the wildlife of the public lands in the West," and that loss of control and right to water on public lands will "reduce wildlife habitat quality by promoting wildlife-livestock conflicts." AR 68007. The BLM's interdisciplinary team further noted that the "present ability of BLM to hold water rights to benefit wildlife, particularly fish has been significant." *Id.*

The Final EIS discusses the change in rangeland improvement ownership, but instead of analyzing the environmental consequences of the proposed ownership changes, the Final EIS focuses on potential development and economic gain, stating that the new ownership provisions may stimulate an increase in private investment in the construction of rangeland improvements. Final EIS at 4-25, 4-11;AR 661, 647. The Final EIS reports that the BLM projects that under the 2006 Regulations there would be approximately 1,200 new rangeland improvement projects developed each year over the next five years. Final EIS at 4-11; AR 647. There is no discussion in the Final EIS of the environmental impact of this increased construction.

As to the changes in water rights, the Final EIS concludes without explanation that the proposed regulations would have little or no effect on present water resource conditions. Final EIS at 4-36.

### 4.  Summary NEPA discussion

Plaintiffs' first claim is that the BLM failed to take a "hard look" at the environmental consequences of the proposed regulatory changes, and that the BLM's approval of the 2006 Regulations was, therefore, arbitrary and capricious. *See Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 599 (9th Cir. 2010). We review the regulatory

changes together in considering whether the BLM violated NEPA.

**[10]** An agency considering "major federal actions significantly affecting the quality of the human environment" has an obligation under NEPA to prepare an EIS that in "form, content and preparation foster[s] both informed decision-making and informed public participation." *Native Ecosystems Council v. United States*, 418 F.3d 953, 958 n.4, 960 (9th Cir. 2005) (internal quotation marks omitted). The "hard look" "must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made," *Metcalf*, 214 F.3d at 1142, and the final EIS must include a "discussion of adverse impacts that does not improperly minimize negative side effects." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1159 (9th Cir. 2006), *abrogated on other grounds by Winter v. Natural Res. Defense Council, Inc.*, 129 S. Ct. 365, 375 (2008). "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1(b). "[G]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998) (internal quotation marks omitted).

**[11]** Here, the BLM failed to address concerns raised by its own experts, FWS, the EPA, and state agencies. For example, the BLM offered no reasoned analysis whatsoever in support of its conclusion—which is in direct conflict with the conclusion of its own experts and sister agency, FWS—that there will be no environmental effect caused by both the across-the-board reduction in public involvement in management of grazing on public lands and the elimination of public input into particular management decisions. Similarly, the BLM never seriously considered the concerns raised by FWS and the California Department of Fish and Game among others

that the 2006 Regulations weaken the ability of the BLM to manage rangelands in a timely fashion. As FWS explained in its comment, "in the west, environmental, and therefore, vegetation changes happen stochastically, rapidly, and often involve extremes," and "it is important for BLM range professionals to respond immediately and to the extent necessary to avoid a change in range condition from which it may take decades to recover." AR 68062. The BLM's Final EIS also does not address the consequences of increased construction and private water rights on public rangeland, despite concerns expressed by its own expert scientists that the "present ability of BLM to hold water rights to benefit wildlife, particularly fish has been significant."

Instead of a serious response to FWS's concerns and an analysis and consideration of the various delays and impediments in the BLM's stewardship of public rangelands, as required by NEPA, the Final EIS downplays the environmental impacts of the 2006 Regulations. The BLM, invoking notions of efficiency, justifies the reduction in public participation and the elimination of the Fundamentals of Rangeland Health as enforceable standards by stating that the 2006 Regulations are "anticipated to improve the efficiency and effectiveness" of grazing administration. Final EIS at 4-23. The Final EIS does not address the environmental consequences of a mandatory five-year delay in implementing reductions of ten percent or greater in active use on a permittee's grazing land, but rather speculates that this delay would "often result[ ] in improved cooperative relations and management between BLM and the permittee or lessee." *Id.* at 4-25.

While diplomacy with permittees or lessees of public rangelands is certainly a worthy goal, it is no substitute for the BLM's obligations to comply with NEPA and to conduct a studied review and response to concerns about the environmental implications of major agency action. *See Earth Island Inst.*, 442 F.3d at 1159 (explaining that the final EIS must include a "discussion of adverse impacts that does not

improperly minimize negative side effects"). While we recognize that NEPA is a procedural statute, which "exists to ensure a process, not to mandate particular results," *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 936 (9th Cir. 2010) (internal quotation marks omitted), part of the procedure required is that an agency in its Final EIS address "any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised." 40 C.F.R. § 1502.9(b). "This disclosure requirement obligates the agency to make available to the public high quality information, including accurate scientific analysis, expert agency comments and public scrutiny, before decisions are made and actions are taken." *Center for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167 (9th Cir. 2003) (citing 40 C.F.R. § 1500.1(b)). When an agency, such as the BLM, submits proposed regulatory changes for public comment and then offers no meaningful response to serious and considered comments by experts, that agency renders the procedural requirement meaningless and the EIS an exercise in "form over substance." *See Metcalf*, 214 F.3d at 1142.

**[12]** Here, the BLM gave short shrift to a deluge of concerns from its own experts, FWS, the EPA, and state agencies; the BLM neither responded to their considered comments "objectively and in good faith" nor made responsive changes to the proposed regulations. *Id.* "[P]ublic scrutiny [is] essential to implementing NEPA," 40 C.F.R. § 1500.1(b), and the BLM was required to "assess and consider . . . both individually and collectively" the public comments received during the NEPA process and to respond to such in its Final EIS. *Id.* § 1503.4(a); *see Center for Biological Diversity*, 349 F.3d at 1167 (holding that the agency in that case violated NEPA when it failed "to disclose and discuss responsible opposing scientific viewpoints in the final statement"). We therefore conclude that the BLM violated NEPA by failing to take a "hard look" at the environmental consequences of the proposed regulatory amendments.

**[13]** In addressing the new monitoring requirement, the Final EIS concludes that the impact on the agency will be minimal because only 16 percent of the allotments evaluated during the last five years failed to achieve standards and conform to guidelines. Final EIS at 4-26. The BLM, however, currently monitors and has data on only a third of the total allotments. Final EIS at 4-24. Having no monitoring data on the vast majority of the land the BLM monitors, and offering no corroborating scientific evidence, the assertion that the 16 percent finding is representative is unsupported. *See Earth Island Inst. v. Hogarth*, 494 F.3d 757, 763-64 (9th Cir. 2007) (explaining that we generally defer to an agency's expertise in the methodology of the agency's studies but a result that is not rationally connected to the best available scientific evidence receives no such deference). Furthermore, even if we credit the BLM's estimate that 16 percent of all BLM grazing does not meet the Standards and Guidelines, 16 percent of all BLM public rangelands still amounts to over 25 million acres. The Final EIS does not consider the environmental impact on the over 25 million acres of affected public rangelands of the requirement, under the 2006 Regulations, that monitoring data be collected by the agency prior to bringing an enforcement action. By failing to consider the impact of the 2006 Regulations on over 25 million acres of affected public rangelands, the BLM "entirely failed to consider an important aspect of the problem," and, therefore, its no effect conclusion was arbitrary and capricious. *The Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc)*, abrogated on other grounds by Winter*, 129 S. Ct. at 375.

Furthermore, the BLM failed to consider the combined and synergistic effects of the proposed amendments. *See Or. Natural Res. Council*, 492 F.3d at 1132 (explaining that one of the "specific requirements under NEPA is that an agency must consider the effects of the proposed action in the context of all relevant circumstances, such that where several actions have a cumulative . . . environmental effect, this consequence must be considered in an EIS" (quotation marks omitted)).

For example, the reduction of public participation in various grazing management and permitting decisions is logically compounded by the increased difficulty in maintaining "interested public" status as to a given allotment in the first place. Similarly, the dual changes of reducing the data that must be considered when monitoring an allotment, and permitting enforcement actions to be brought only where there is available monitoring data, combine synergistically to reduce enforcement significantly. Furthermore, phased in reductions of corrective measures, delayed corrective actions, and the requirement that monitoring data be available before corrective action is taken each delays enforcement and impedes agency responsiveness. Together, the effects of these changes are even more dramatic, resulting in greater delay and greater environmental impact. As the BLM's own experts noted, "these cumulative delaying tactics could result in a protracted 7 year period for full implementation and change" and therefore "would result in long-term, adverse impact upon wildlife resources." AR 68008. We agree with the district court that the BLM violated the procedural requirements of NEPA and failed to take a "hard look" when it failed to consider the combined effects of the 2006 Regulations. *See City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1312 (9th Cir. 1990) ("NEPA requires that where several actions have a cumulative or synergistic environmental effect, this consequence must be considered in an EIS.").

Finally, we note that the Final EIS offers no reasoned explanation for the BLM's change of policy from the 1995 Regulations. "[A]n agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

The Supreme Court has said, in considering an agency's decision to change its regulatory policy, "[i]f Congress established a presumption from which judicial review should start,

that presumption . . . is . . . *against* changes in current policy that are not justified by the rulemaking record." *Id.* at 42 (emphasis in original). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* at 43 (internal quotation marks and citation omitted).

Here, the BLM decreased its regulatory authority over rangeland management, decreased the role of the public in overseeing that management, and granted permittees and lessees increased ownership rights. These changes are inconsistent with the 1995 Regulations and discordant with the lessons learned from the history of rangeland management in the west, which has been moving towards multiple use management and increased public participation. The BLM itself acknowledges in the Final EIS that public input helps identify environmental impacts. As the district court pointed out, when the BLM enacted the 1995 Regulations the BLM recognized with respect to public participation that:

> Experience has shown that the greater and more meaningful the participation during the formulation of decisions and strategies for management, the higher the level of acceptance and thus the lower the likelihood of a protest, an appeal, or some other form of contest.

*W. Watersheds Project,* 538 F. Supp. 2d at 1313 (quoting 60 Fed. Reg. 9894, 9924 (1995)).

**[14]** Nonetheless, the BLM makes substantial reductions in the avenues for public input because, as the BLM explains, such input is at times "inefficient" and "redundant." Appendix FEIS at 37. The BLM's rationale falls short of the requirements of NEPA and the APA. The BLM has failed to consider relevant factors, failed to articulate a rational connection between the facts put forth by agency experts and the choices

made, and changed course from current policy without a reasoned explanation. In short, the BLM's Final EIS has not provided a "full and fair discussion" of the environmental impacts of the proposed regulatory changes, 40 C.F.R. § 1502.1, impairing both the ability of the BLM to reach a reasoned decision and the ability of the "larger audience" to play an effective role in the decisionmaking process. *See Dep't of Transp.*, 541 U.S. at 768. Therefore, we conclude that the BLM has failed to take a "hard look" at the environmental impacts of the 2006 Regulations as required by NEPA, and its conclusion in the Final EIS that the proposed action would have no significant environmental impact is arbitrary and capricious under the APA. We affirm the district court's grant of summary judgment to Plaintiffs.

## D.    Endangered Species Act

The Supreme Court has called the ESA "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). The ESA reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Id*. at 185.

[15] The heart of the ESA is section 7(a)(2), 16 U.S.C. § 1536(a)(2). Section 7(a)(2) requires a federal agency to "insure that any action authorized, funded, or carried out" by the agency "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2); *see Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009). Section 7(b), a procedural component of the ESA, requires a federal agency to complete formal consultation with FWS if the agency determines that any action on its part "may affect" any listed species or critical habitat. 16 U.S.C. § 1536(a)(2)-(c); 50 C.F.R. § 402.14(a); *see Cal. ex rel. Lockyer*, 575 F.3d at 1018.

Here, the BLM concluded that the proposed 2006 Regulations would have no effect on endangered or threatened species or their critical habitat and, therefore, did not consult with FWS. *See Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1447-48 (9th Cir. 1996). The BLM explained in the Final Rule that

> none of these eighteen administrative changes will have an effect on listed or proposed species or proposed or designated critical habitat. . . . Thus . . . the BLM has fulfilled its obligations under section 7 of the ESA and has determined that the proposed revisions will have no effect on listed or proposed species or proposed or designated critical habitat.

Final Rule, 71 Fed. Reg. 39402.

Plaintiffs contend that the BLM violated the ESA by failing to consult with FWS before approving the 2006 Regulations. Plaintiffs challenge the BLM's failure to consult under the citizen-suit provision of the ESA. 16 U.S.C. § 1540(g)(1). The citizen-suit provision allows individuals to bring suits "to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision of this chapter or regulation issued under authority thereof." *Id.*; *see Bennet v. Spear*, 520 U.S. 154, 173 (1997); *Washington Toxics Coal. v. EPA*, 413 F.3d 1024,1030 (9th Cir. 2005). The citizen-suit provision "is a means by which private parties may enforce the substantive provisions of the ESA against" government agencies. *Bennett,* 520 U.S. at 173. Because Plaintiffs's claim is available under the ESA, this court looks to the ESA and not to the APA. *See id.* at 164 (determining first whether citizen-suit provision of ESA applied and then applying APA to remaining ESA claims); *Coos County Bd. of County Comm'rs*, 531 F.3d at 802 (determining that "if a plaintiff can bring suit against the responsible agencies under a citizen suit provision, this action precludes an additional suit under the APA" (internal quota-

tion marks, citation, and brackets omitted)). "Because ESA contains no internal standard of review, section 706 of the Administrative Procedure Act, 5 U.S.C. § 706, governs review" of the BLM's actions and "the normal 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' standard applies." *Village of False Pass v. Clark*, 733 F.2d 605, 609-10 (9th Cir. 1984); *see also Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1193 (9th Cir. 1988).

Accordingly, Plaintiffs argue that the BLM's no effect finding was arbitrary and capricious and, therefore, that the BLM's determination that consultation was not required was not in accordance with law. The minimum threshold for an agency action to trigger consultation with FWS is low, and we conclude that the regulatory amendments here—which affect 160 million acres of public land, home to hundreds of special status species—handily meet that threshold.

To determine whether the BLM's no effect determination was arbitrary and capricious, we must decide whether the BLM "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 841 (9th Cir. 2003) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983)). A federal agency "must initiate formal consultation if its proposed action 'may affect' listed species or critical habitat," and "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." 51 Fed. Reg. 19,949; *see Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018-19 (9th Cir. 2009). The BLM's decision to forgo consultation with FWS must be reversed if the BLM "entirely failed to consider an important aspect of the problem" or "offered an explanation that runs counter to the evidence before the agency." *The Lands Council*, 537 F.3d at 987 (internal citation and quotation marks omitted).

**[16]** The sheer number of acres affected by the 2006 Regulations and number of special status species who reside on those lands alone suggest that the proposed amendments "may affect" a listed species or its critical habitat. The BLM's grazing regulations affect roughly 160 million acres of public lands, home to hundreds of special status species. Indeed, because of the sheer number of special status species present on those 160 million acres, the BLM lists the names of *all* the special status species in the West in the Final EIS. Final EIS at Appendix 1. The list includes over 300 special status species: 30 species of birds; 49 species of fish; 39 species of mammals; 137 species of plants; 8 species of snails; 10 species of crustaceans; 6 species of reptiles; 15 species of insects; and 11 species of amphibians that are endangered, threatened, or candidate species in the West. *Id.* (containing a 35 page table that lists identified special status species). Presumably and logically, the BLM listed these species—over 300— because many of them are found on the affected 160 million acres. Still, the BLM maintains—contrary to the experts' reports—that the regulatory changes will not affect so much as one special status species, animal or plant, or its habitat.

Furthermore, we find it significant that FWS, the agency that "is primarily responsible for protecting endangered species," and that has what we have previously referred to as "the more appropriate expertise," concluded that the 2006 Regulations *would* affect status species and their habitat. *Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987).

FWS explained that "[w]ild ungulates, sage-grouse, neotropical migrant birds, pygmy rabbits, and various raptors are all influenced by the presence and distribution of livestock in the western sagebrush-steppe ecosystem," and "[t]he proposed revisions seek to change the ways livestock will be managed spatially and temporally." AR 68069. FWS identified the greater sage-grouse and its habitat as being particularly vulnerable to the extension in the amount of time the BLM would take to make needed grazing changes. AR 68059.

FWS was "most concerned" that "public coordination is not required for renewal or issuance of grazing permits/leases" and the 2006 Regulations provide for private ownership of water on public lands. AR 68060, 68071 (noting that "[t]here is no more important resource for fish and wildlife in the arid west than water"). As FWS explained, "[p]ublic input is an important component of ensuring [a] complete and accurate analysis," and "[i]mproperly managed permits or leases could have negative effects for listed and sensitive species." AR 68060. With respect to the change in water ownership, FWS reasoned that "private water users seeking exclusive control of a water source on public lands for livestock grazing purposes would reduce habitat quality (for wildlife)" and that this would "have a slow, long-term adverse effect on wildlife as a whole and biological diversity in general." AR 68070 (quoting the Bureau of Land Management, Rangeland Reform '94: Final Environmental Impact Statement (1994)).

Not only FWS but also the BLM's own scientists advised the agency that Section 7 consultation was necessary. One scientist, an ARC-DEIS team member and BLM wildlife biologist for 30 years, concluded that "we are definitely in a 'may affect' situation and should therefore consult." AR at 68227. The lead representative from the BLM's Fish and Wildlife Program concluded that consultation was a "no brainer," and a BLM fisheries biologist concluded that "[s]everal of the regulation changes within the proposed action are likely to adversely affect listed species . . . , which triggers the need to consult with FWS." AR 68193.

Plaintiffs also submitted extra-record material in the district court supporting their "may affect" argument. Intervenors argue that this court may not look to extra-record material in conducting a review under the ESA. As we explained in *Washington Toxics Coalition*, the APA applies only where there is "no other adequate remedy in a court," 5 U.S.C. § 704, and—because the ESA provides a citizen suit remedy—the APA does not apply in such actions. 413 F.3d at 1034.

Therefore, under *Washington Toxics Coalition* we may consider evidence outside the administrative record for the limited purposes of reviewing Plaintiffs' ESA claim. *See id.* at 1030, 1034.

Erick Campbell, a wildlife biologist for the BLM since 1976, submitted a declaration in support of Plaintiffs' ESA claim. Decl. of Erick Campbell ¶¶ 3-4. Campbell wrote the terrestrial special status species sections for the ARC-DEIS. *Id.* Campbell warned that "direct grazing impacts include livestock consumption of palatable special status plants and direct trampling of special status species, such [as the] desert tortoise," and concluded that the "cumulative effects resulting from all these [proposed regulatory] changes will be significant and adverse for wildlife and biological diversity in the long-term." *Id.* ¶¶ 14, 16.

Robert House, a Certified Fisheries Biologist and Aquatic Scientist with over 35 years of professional experience with FWS and BLM, submitted a lengthy declaration detailing the effects the 2006 Regulations would have on ESA listed salmonids. Decl. of Robert House ¶¶ 1-2. He concluded "that the proposed grazing regulation changes as set forth in BLM's Final EIS 'may affect' and, further, are 'likely to adversely affect' listed and special status fish species and their current and potential usable aquatic and riparian habitat." *Id.* ¶ 9.

Kathleen Fite, who has a Master's degree in Biology and was employed for 9 years as a Senior Wildlife Technician with the Idaho Department of Fish and Game, filed a declaration stating that the affected public lands are home to "hundreds of species of birds and wildlife, including many threatened, endangered and special status species such as the bald eagle, Greater sage-grouse, pygmy rabbit, Columbia spotted frog, desert tortoise, golden eagle, Southwestern willow flycatcher, Mexican spotted owl, burrowing owl, ferruginous hawk, Swainson's hawk, and a variety of migratory birds." Decl. of Kathleen Fite ¶¶ 5-7, 22. Kite detailed the

effect that over-grazing has on the habitat of these species, including causing erosion and destruction of the native plant community. *Id*. at ¶ 31-33. She also pointed out that the 2006 Regulations create incentives to build more range improvements, which will affect "vital habitats for native species such as sage-grouse, desert tortoise, and pygmy rabbit." *Id*. ¶¶ 104-05.

In sum, there is resounding evidence from agency experts that the eighteen amendments to the BLM's grazing regulations, i.e. the 2006 Regulations, "may affect" listed species and their habitat. The requirement that a federal agency considering action consult with FWS is triggered under the ESA if that proposed action "may affect" listed species. *Cal. ex rel. Lockyer*, 575 F.3d at 1018. In 1995, the last time the BLM amended its grazing regulations, it consulted with *FWS. W. Watersheds*, 538 F. Supp. 2d at 1306. Nevertheless, here the BLM concluded, without rational basis, that the 2006 Regulations would not affect listed species or their habitat and that the amendments were purely administrative. As evidenced by the expert declarations, the 2006 Regulations are not purely administrative. They alter ownership rights to water on public lands; increase the barriers to public involvement in grazing management; and substantially delay enforcement on failing allotments, in ways that will have a substantive effect on special status species.

**[17]** "Although our review under the arbitrary and capricious standard is deferential, it does not condone a 'clear error of judgment.' " *Blue Mountains Biodiversity Project*, 161 F.3d at 1216 (quoting *Marsh*, 490 U.S. at 378). Because the BLM failed to consider relevant expert analysis or articulate a rational connection between the facts found and the choice made, we conclude that the BLM's no effect finding and resulting failure to consult were arbitrary and capricious in violation of the BLM's obligations under the ESA. *See National Ass'n of Home Builders*, 340 F.3d at 841.

### E.    Federal Land Policy and Management Act

Plaintiffs also challenged the 2006 Regulations under FLPMA. In enacting FLPMA, "Congress declared that it is the policy of the United States to manage the public lands 'in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air, and atmospheric, water resource, and archeological values.'" *Ctr. for Biological Diversity*, 581 F.3d at 1075 (quoting 43 U.S.C. § 1701(a)(8)). With regard to public participation, FLPMA directs that:

> In exercising his authorities under this Act, the Secretary, by regulation, shall establish procedures, including public hearings where appropriate, to give . . . the public adequate notice and an opportunity to comment upon the formulation of standards and criteria for, and to participate in, the preparation and execution of plans and programs for, and the management of, the public lands.

43 U.S.C. § 1739(e).

**[18]** The parties do not dispute that under § 1739(e), the BLM must provide avenues for public input in the planning and management of the public lands. It is not obvious, however, whether the 2006 Regulations—limiting input and eliminating it entirely from certain management decisions—were in direct and unreasonable disregard of that statutory requirement. Intervenors argue that in resolving that question, the district court erred when it did not afford the 2006 Regulations *Chevron* deference. Intervenors further argue that the regulations do not eliminate public participation (a result Intervenors concede FLPMA forbids), but rather simply alter the circumstances of public participation. We agree as to the former, *Chevron* analysis was required, and reserve judgment on the latter.

**[19]** The district court erred when it failed to apply the analytical framework set out in *Chevron* to the BLM's inter-

pretation of its authority and obligations under FLPMA, as expressed by the 2006 Regulations. *See Chevron*, 467 U.S. at 842-43; *see, e.g., Nw. Envtl. Advocates*, 537 F.3d at 1014 (applying *Chevron* deference to FLPMA claim). Under *Chevron*, the district court was required to determine whether the elimination of public comment as to certain management decisions (but not others) and the changed definition of "interested public" under the 2006 Regulations were in disregard of FLPMA's unambiguous language; or, alternatively, whether FLPMA's public participation requirement is ambiguous and the BLM's interpretation reasonable. *See Webb v. Lujan*, 960 F.2d 89, 92 (9th Cir. 1992) ("We must uphold an agency's construction of a statute if it is consistent with the unambiguous language of Congress, or if the statute is ambiguous, if it is reasonable."). Because the district court failed to apply *Chevron*, we vacate the district court's grant of summary judgment to Plaintiffs on this claim.

**[20]** Although we may affirm the district court's summary judgment ruling on any grounds supported by the record, the issues we would be required to decide under *Chevron* to resolve the Plaintiffs's FLPMA claim are not adequately briefed or argued by the parties. *See Trustees of S. Cal. IBEW-NECA Pension Trust Fund v. Flores*, 519 F.3d 1045, 1048 (9th Cir. 2008) (remanding an issue to the district court where the district court had not considered it and the parties had not adequately briefed it on appeal). For example, if FLPMA's requirements with respect to public participation are indeed ambiguous, *Chevron* analysis in this instance would require a determination of whether the BLM's interpretation of its own authority was reasonable. We are not in a position to make such a determination based on the information provided by the parties and found in the record. Therefore, we deem it appropriate to vacate the court's judgment regarding the FLPMA claim and to remand this claim to the district court for further consideration under *Chevron* in the first instance.[9]

---

[9]Although we remand the FLPMA issue to the district court for further consideration, we do not foreclose the possibility that one or both parties may argue that the case or the FLPMA issue is moot. The district court is free on remand to consider any such argument.

## V.  Conclusion

The BLM violated both NEPA and the ESA. We affirm the district court's grant of summary judgment in favor of Plaintiffs as to these claims, and we affirm the district court's permanent injunction enjoining the BLM's 2006 Regulations.[10] *See Wash. Toxics Coal.*, 413 F.3d at 1034 ("It is well-settled that a court can enjoin agency action pending completion of section 7(a)(2) requirements."); *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 (9th Cir. 2002) (explaining that "effectuating Congress' clear intent [in passing the ESA] required issuance of an injunction" (citing *TVA v. Hill*, 437 U.S. 153, 193-95 (1978))).[11] Because the district court failed to consider Plaintiffs' FLPMA claim under the framework and with the deference set forth in *Chevron*, we vacate the district court's grant of summary judgment in favor of Plaintiffs on this claim.

AFFIRMED    in    part;    VACATED    in    part;    and REMANDED.

Plaintiffs shall recover their costs on appeal.

---

[10]Intervenors do not challenge the scope of the injunction on appeal. Any argument concerning the nature and scope of the district court's injunctive relief is, therefore, waived. *See, e.g.*, *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1033 (9th Cir. 2008).

[11]The district court, however, remains free to make any necessary modifications to the injunction, if warranted, after it addresses Plaintiffs's FLPMA claim on remand.